521-0301-WC, Jerry Field, Appellant by Bruce Rizor versus the Illinois Workers' Compensation Comm'n, the American Coal Company, Appellee by Julie Webb. Mr. Rizor, you may proceed. And it was against the manifest way to the evidence. The strongest argument is always the matter of law argument, and here's the first one. Section 1S applies to both parties. Claimant has to offer evidence to prove disease within two years of the date of last exposure, and the respondent must recognize that claimant's disease is compensable if it manifests within two years of the date of last exposure. In this case, the most recent x-ray read by respondent's experts was taken in March of 2016, a year and two months prior to the running of 1F. Universal testimony was that CWP can first manifest itself and can progress even after the date of last exposure. So, claimant's CWP could have first manifested itself to the satisfaction of Meyer and Castle any time in the year and two months between the date of the x-ray they read and the end of the Section 1F period. Nobody beating this record could say that couldn't happen without insulting Dr. Meyer and Dr. Castle to say that they would never find an x-ray positive. Now, claimant is aware that the question could be asked, has been asked in the past, couldn't the commission have decided that Smith and Cohen were wrong in their positive readings because Meyer and Castle read the same x-rays as negative? Well, the answer is no, because what if Meyer and Castle were given timely x-rays taken over a year later and found them positive? Of course, we'll never know because respondent chose to not give them timely x-rays. But if they had been given timely x-rays and they found them positive, then all four readers would have agreed that claimant has CWP. The only conflict would be in who read it first or on which timely date did it first appear. Now, this case didn't go to arbitration until 2020, three years after Section 1F ran. Respondent's x-rays are not timely because that's what it wanted, not because that's what it was that were read too early. The longer they wait, the more time the progressive disease has to show up. Section 1F must be applied equally to both parties. Mr. Messore, if I could interject a question, you relied on the expert testimony or the experts, Dr. Istanbuli, Dr. Cohen, Dr. Smith, the respondents relied on the expertise of Meyer, Cohen, Castle, excuse me, and the NIOSH B readers. But I want to ask you a point of question, something I found very interesting. The commission in this case, and perhaps not in all cases, specifically articulated reasons why they found the testimony of the respondents experts to be more persuasive. But I'd like you to address this specifically. The commission noted that if readings of Dr. Cohen and Dr. Smith were accurate, it would mean that over time the opacities that were present shrank in size and disappeared from the upper lung zones. However, the evidence presented at the arbitration hearing, as we know, is that CWP is permanent, and the opacities resulting therefrom will not shrink in size or disappear from the lung zones over time. So how do you respond to that apparent inconsistency? Yes, the mistake that the commission is making there is it's not recognizing that all B readers don't read exactly alike. Within those B readers who read an x-ray positive, there is room for disagreement among them. There are some readers that are more conservative than others, some more opacities. It's easy to be consistent when you say there are none. Now, when you say there are some, you've got to say, okay, let's take a look at what the commission said here. And Dr. Cohen read Q opacities. Those are larger opacities than P opacities. But here's how much. A P opacity can be up to 1.5 millimeters. A Q opacity is over 1.5 millimeters. So these two readers could have read within two millimeters of each other. In other words, imperceptible to the human eye and still come up with the readings they had. Also, Dr. Cohen read his x-ray, and I think it was 2009. It was close to a decade before Dr. Smith read his. Now, so during that time, because I've answered the P and Q thing. They're just so close, you can't tell them apart. And that, both being positive, that's okay. Now, there's also the thing about the upper lung zone and the lower lung zones. And my answer is that Cohen, reading a decade before, didn't find any in the lower lung zones. They could have appeared in that decade. Smith did not find any in the upper lung zones. But again, that could just be his conservative reading. So the most important thing is, they both found them to be positive. And the infirmity in the commission's review of these x-rays is the timing of them. I don't know of anything, Justice, I don't know of anything that requires all positive readings to be identically positive. I think the standard is, are they positive? And in that case, it was met. The problem with what the complete x-ray readings by respondents to experts, if we have to assume that nobody has CWP until they have it, and they read it as negative when they read it, but there was still a year and a half that the x-rays would have been compensable, that this progressive disease could have moved on to the satisfaction of Meyer and Castle. We won't know, because respondents specifically had them read x-rays that were a year and a half before 1F would run. And my point here, the legal point I'm trying to make is that 1F should apply equally to both sides, not just as a bar to claim it and a whimsical thing for respondents. When a respondent, by its own choice, turns in x-rays that are not complete, they don't answer that question, did he have it by the end of 1F? Then they're not relevant. They're not credible for their purpose. I hope that answers your question. Sort of. I think I found it somewhat anomalous that they would disappear, but you've given your explanation, so we'll go from there. Yes. Thank you. It can. The other thing that's interesting about that is they look at these two not that the two readers just read differently. One is more conservative than the other. So thank you very much. Moving on here, right alongside that point is that respondents chose to give these incomplete x-rays. They chose to have them read early x-rays. And why wouldn't they? The longer they wait, the earlier they can have these x-rays, the less time there is for the x-ray to turn positive. And to quote Beelman Trucking, the Workers Compact is a remedial statute intended to provide financial protection for injured workers and is to be liberally construed to accomplish that objective, not be used as a hammer against the B readings that don't answer the question of whether the claimant developed CWP within the time period of Section 1F are incomplete and they're incompetent to be considered to be relevant negative opinions. As a matter of law, the incomplete readings of Meyer and Castle cannot prevail. And here's the test I ask you to apply to this and any other cases similar. Is it possible that the respondents readers could have read them positive had they read a later x-ray? I don't see how the answer is anything but yes, but. Well, Mr. Wiseau, aren't you asking us to sort of engage in some speculation here? The speculation is being engaged in by the commission. I'm taking the x-ray exactly as presented. It's an x-ray of 2016. This man's time didn't run out for another year and two months after that. And this is a progressive disease and could have been positive. Now, all I'm doing, I'm not speculating on whether how they would have read it. I'm just saying all they would have had to do to answer all these questions is to take a timely x-ray. Recognize that 1F applies to both parties. Take a timely x-ray. That would have answered everything, but they didn't. And I don't think that that the claimant should have to pay for that strategy or that tactic of respondent. So yes, I think that's the problem. There is speculation and conjecture being done by the commission. They're speculating that these Mr. Wiseau, you're not suggesting any way that the respondent has the obligation to disprove CWP, are you? Well, that's an interesting thing we've gone through in a number of past arguments. And I would say de jure, no, but de facto, yes. In other words, once I put in two positive B readings, it's still my obligation to prove CWP. But once I put in two positive, they better start putting in negatives or I'm going to win that argument. So while the burden is on me, the burden is not on them to prove it's not there. The burden is on them to have a preponderance of the evidence. Didn't the commission find that they met their burden with respondents experts? I don't see how they could when nobody here, nor the commission can say that Castle and Meyer would not have read a later x-ray positive because everybody agrees that in the record, it's in the Sims case by the court. This is a progressive disease, and it can show up after you leave the coal mine. So this man had a year and two months to go by and he's coming up with a new claim against Section 1F. And so no one can say, I don't think anybody can say, that these two B readers could not have found it positive. Now, that's not speculation saying they would have, but it is the absolute truth saying they didn't and they didn't look. That's why we'll never know. So I think looking at that and determining which side is doing the speculating is a key to what you'll be doing when you render your decision here. But I got something else to back this up. The misunderstanding of the law and the importance of the timing of the x-rays was made abundantly clear by the commission when it wrote that the independent NIOSH B readings were more persuasive. The key is, as well as, the commission considered them the same. And when they did that, they told you they have no concept of timing. NIOSH x-rays were taken in 1999, 2009, and 2011. Claimant had until 2017 for a CWB to show up on about the claims, a chest x-ray in 2017. In fact, I look at the commission's decision, or if that was what they were really intending to do, to accept the early x-rays of Castle and Meyer, kind of like saying, well, this work comp claimant could not have had a broken leg in 2017 because we just looked at this 2016 x-ray, and it was just fine. So with that in mind, the next thing the commission did on legal errors is make legal errors within legal errors. It's a matter of interest that even though the failure to find disease made the issues of disablement and timely disablement moot, the commission made rulings on them as if it had its decision on the issue of disablement than it did on the issue of disease. This is an error of law that supports the contention that the commission considered what it believed claimant's disablement to be when it was making its decision on disease. In other words, a no harm, no foul analysis is what they came out with. They thought that the PFTs were normal, therefore, it couldn't have a disease. Now, the commission's error of law within its error of law is its site to the Dawson case. It established, to establish that claimant did not meet the second prong of the definition of disablement in the act. It cited the requirements for disablement. As they appear- Mr. Wiseau, the red light has gone on. You probably can't see it though, obviously, right? Yeah, I don't know if you can see it. I cannot, no. Okay. But are there any questions at this point from the court for their questions for Mr. Wiseau? No. Okay. Mr. Wiseau, you'll have time and reply. Thank you. Ms. Webb, you may respond. Thank you. May it please the court, Mr. Wiseau, my name is Julie Webb and I represent American in this case. First, let's begin with talking about this 1F argument. I would submit that 1F does not apply, well, Mr. Wiseau has been using the word equally to both parties. The employee, Mr. Field here, has the burden of proving the presence of a disease within that two years. Here, we're equating disease to disablement, which is a totally separate argument, but for the purposes of my argument here, we're going to say that it has to be within that two-year period. He's trying to shift that burden of proof to the employer to prove that there was no disease present. As Justice Hudson noted, that's a burden-shifting requirement that is not in the Occupational Disease Act. There's nothing that requires the employer to produce x-rays that were taken more than two years after the date of last exposure. The respondent's evidence is not incomplete. The employer produced evidence in response to the positive chest x-ray be reading by Dr. Smith, the positive reading by Dr. Istanbuli. The commission, who's charged with their responsibility, and there was sufficient evidence in this record to support their finding that the be readings by Dr. Smyer and Dr. Castle were more credible. When were those readings made? The actual readings themselves, the x-ray was taken March 28, 2016. Honestly, I don't recall what day the readings were completed, but it would have been based on his chest x-ray findings as of March 28, 2016. With regard to this question about the difference between Dr. Smith's be reading and Dr. Cohen's be reading, yes, I think all of the be readers in this case testified would agree that there can be some variability between be readers in interpreting chest x-rays, but this is a little bit more significant difference than the employee would lead you to believe. Yes, we're talking about a opacity being less than 1.5 millimeters or less. That's what these be readers are trained to do, is to make that distinction. The evidence is clear that this disease of Coleworkers' pneumoconiosis can be a slow, progressive disease, and it's permanent. It's not going to regress in size or location. What do you make of the argument or the observation of the commission that if the readings of Cohen and Smith were correct, were accurate, it would mean that over time the opacities that they noted that were present shrank in size and would have disappeared from the upper lung zones? Right, and I think what that indicates is what these, or certainly what Dr. Cohen was seeing, is not pneumoconiosis. Those opacities of pneumoconiosis are not going to go from a size Q to a size P. I think what the commission is saying there, which supports their argument or their position that this is not pneumoconiosis, is they're saying those readings are not consistent with what you would see for the presentation of pneumoconiosis or its progression. Also, I would like to point out that while Mr. Besore has argued that the NIOSH B readings are not relevant because they were all taken well before the two-year statute of proposed, they are relevant when we're looking at serial x-rays here. We're talking about pneumoconiosis being a slow, progressive disease. This man had been in the coal mine for 35-plus years, and over that time, from 1975 up until 2011, these NIOSH x-rays were all consistently read as negative. Those are independent readings. The NIOSH B readers weren't retained by Mr. Field or by American Coal. Those are being read by independent B readers, and particularly if we look at the later ones, the 2009 and 2011 B readings, those were done after Dr. Cohen's reading of the November 2004 chest x-ray. They didn't see anything. Those were interpreted as negative. So, if they, he had, Mr. Field had a chest x-ray that had Q size opacities. Now, when we're talking, you know, 1.5 millimeters, we're not talking very big, but we're still talking, that's the middle size opacity. If there had been something on that film of that size, the B readers for NIOSH would have seen something on those subsequent chest x-rays. Again, there's sufficient evidence in the record for the commission to find that Dr. Meyer and Dr. Castle were the most persuasive and credible B readers, and those, their commission's finding with regard to that should be upheld. One additional point that I want to address is this, the issue about Dr. Alexander's diagnosis of pneumoconiosis in his treatment records. The, Mr. Field has alleged that Dr. Alexander was an employee of American Coal, was the employer's doctor. It is true that Dr. Alexander performed a pre-employment physical for American Coal before Mr. Field went to work for American Coal. However, Dr. Alexander was Mr. Field's treating physician. He treated Mr. Field before he went to work for American Coal. Mr. Field continued to use him as a treating physician after he left American Coal, and even his testimony at arbitration, Mr. Field described Dr. Alexander as his treating physician. He also said that he never talked to numerous times, I think there's 17 entries total in Dr. Alexander's record where co-workers' pneumoconiosis is mentioned. There's nothing, and only two of those, was it an assessment or a diagnosis. Most of those entries, it was listed under current problems, and what's interesting is under there it says co-workers' pneumoconiosis hyphen state. So, I guess he only had co-workers' pneumoconiosis as far as a state claim was considered, not a federal claim, and Mr. Field testified that he told Dr. Alexander that he had black lung. There's no chest x-ray, any testing of any type in Dr. Alexander's records that supports a finding of pneumoconiosis. This is a history that got into Dr. Alexander's records and is being carried forward. So, Dr. Alexander's entries regarding pneumoconiosis are not controlling or were not completely ignored by the commission. They simply do not support the finding that Mr. Field suffered from pneumoconiosis. And again, in Dr. Alexander's records, not only is there no, so I'll take that, there is a couple, there are a couple of chest x-rays and they're both negative, but there's nothing in there to support a positive finding of pneumoconiosis. Any complaints of a pneumoconiosis, the petitioner in March of 2000, now this is nine years before he went to work for American Coal, he saw him for evaluation of a possible lung disease. There's no record that Mr. Field had pulmonary symptoms at that time. And there were some abnormalities on the pulmonary function testing, but Dr. Alexander said that was a problem with calibration of the machine and the wrong age being entered for Mr. Field. And he didn't find any pulmonary disease in him at that time. In April, on April 14th, 2014, under the review of systems and respiratory, there's a complaint of some dyspnea, and there was some on the physical examination, heard some crackles, but there was no pulmonary diagnosis at that time or no treatment. And that was an isolated office visit that contained any type of pulmonary symptoms. So again, we believe there is sufficient evidence in this record to support the commission's finding that Mr. Field did not have pneumoconiosis, and we would ask that the Thank you, Ms. Webb. Any questions from the court? Okay. Mr. Wozor, you may reply. Three quick things about what Ms. Webb just said, and then back to where I left off. First of all, if the respondent is not required to bring forth any evidence, if they don't have some share of this weighing process burden, then why did respondent offer Meyer and Castle? I think it speaks for itself. Second thing is, about the difference that Justice Hudson was asking me, the difference that the commission pointed out between Cohen and Smith, here's the question that resolves that. If the Cohen and Smith x-rays were taken on the same day and were written exactly as they showed up in this record, wouldn't they both be positive? Nothing disappeared, nothing shrank, it's just they read them a different way. Why? Because they're read on two different days, must you make these assumptions, unwarranted assumptions, that something shrank or something disappeared? Just two different B readings. And the last thing, regarding Dr. Alexander that was talked about here, he did a pre-employment physical. Now, can you imagine a coal company paying a doctor to do a pre-employment physical for a coal mine and not finding out something about his chest or chest x-ray? I don't know where the x-ray is, I don't know if the records that were obtained were complete, but he is certainly qualified and he was certainly an employee of the coal company. Now, where I left off in my first part there, as to the commission's error of law within its error of law was its cite to the Dawson case, and it did that to establish a claim it did not meet the second prong of the definition of disablement in the act. It cited the requirements for disablement as they appear in Dawson, but Dawson was a wage differential, and this is an 8D2. The requirements of Dawson for disablement don't apply here, and I refer back to the Robert Deere case of this court where the court said, quote, the employer cites Dawson, however, Dawson is inapposite. Dawson involved a wage differential claim under 8D1, not a claim for PPD benefits under section 8D2 as in this case. Same thing here. At some point, the commission should be important legal errors would not be fair to claim it. It wasn't just one. I also request that the commission be required to maintain a consistency in the basics of its decisions. A whimsical application of logic to the facts of cases here and there gives claimants no foundation on which to build their cases. The court may take judicial notice of the many times that black lung claims have been denied by the commission because the diagnoses asserted were not contained in the treatment records. Well, in this case, as noted in the dissenting opinion at the commission, the claimant's primary care physician was Dr. Alexander, who was also Respondent's company doctor, and in this specific case, Dr. Alexander is the one who gave this claimant his preemployment physical with Respondent. And in the treatment records, Dr. Alexander included the diagnosis of CWP 17 times. And he referred to black lung benefits seven times. He was tying the two together and continuing to find CWP. Now, I don't know whether to call this specific thing an error of law or a matter of the manifest way to the evidence, but I do know that it's wrong for the commission to be jumping from one side of the fence to the other on this what's in the treatment record thing, specifically when it's always, always to the detriment to the claimant. It's not right. They shouldn't be able to do that. I also ask that the court recognize that Dr. Castle, in his records review, only noted one of the 17 times the other company doctor, Dr. Alexander, found CWP. Given these facts, Dr. Castle is anything but most persuasive, but you know what? If the commission just read Dr. Castle's report and was relying on that, there was only one diagnosis of CWP in there from Dr. Alexander. That could be a reason they got the wrong outcome. I request that the court reverse the decision the commission is being wrong as a matter of law on multiple counts and also as being against the manifest way to the evidence. When this case was filed, respondent knew that its own doctor had diagnosed CWP numerous times. So did it settle? No. It went to Wisconsin to get a B reading from Dr. Meyer and to Hilton Head, South Carolina to get a B reading in a records review from Dr. Castle. Respondent should not be rewarded for such behavior. I repeat, the day this claim was filed, the commission, the respondent knew that his own doctor had diagnosed CWP numerous times and talked about tying it to black lung claims. It should have settled. In a right world, it should have settled. Instead, it tried to find doctors to impeach its own doctor, sold that to the commission. Mr. Wazor, the red light did go on, and so we must conclude your argument at this time. Thank you. Thank you. Thank you, Mr. Wazor. Any questions from the court for Mr. Wazor in his reply? No? Okay. Thank you, counsel.